UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK GIFFORD, SAMMY LEWIS,
RON MCCULLOCH, MARK VOGELEI
AND KENNETH MARVIN JONES,

              Plaintiffs, on behalf of themselves       Case No. 09-cv-13486
              and other persons similarly situated,

                                          Paul D. Borman
                                          United States District Judge

v.

MICHAEL A. MEDA; MEDA PAINTING
AND REFINISHING, INC., a Michigan
Corporation; MICHAEL MATTEI, Jointly
and Severally,

              Defendants.
_____/

OPINION AND ORDER
(1) GRANTING DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P.
12(b)(6) (DKT. NO. 8); AND
(2) DENYING PLAINTIFFS' RENEWED MOTION FOR SANCTIONS (DKT. NO. 24)

      Before the Court is Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or

In the Alternative for a Stay of Proceedings. (Dkt. No. 8.) Plaintiffs filed a response (Dkt. No. 11)

and Defendants filed a reply (Dkt. No. 14). On February 22, 2010, the Court held a hearing and

ordered the parties to submit supplemental briefing on the issues of primary and exclusive regulatory

jurisdiction. On March 11, 2010, the parties submitted their supplemental briefs. (Dkt. Nos. 31 and

32.) For the reasons that follow, the Court GRANTS Defendants' motion to dismiss and DENIES

Plaintiffs' Renewed Motion for Sanctions. (Dkt. No. 24.)

# I.    BACKGROUND

Plaintiffs Frank Gifford, Sammy Lewis, Ron McCulloch, Mark Votelei and Kenneth Marvin Jones (collectively referred to as "Plaintiffs") allege that the Defendants Michael A. Meda, Meda Painting and Refinishing Inc., and Michael J. Mattei (collectively referred to as "Defendants") committed mail and wire fraud in a continuing pattern of racketeering behavior in violation of RICO by fraudulently classifying Plaintiffs as "independent contractors" rather than "employees," and failing to deduct from Plaintiffs' wages amounts representing "federal withholding income taxes or FICA (social security and Medicare), and unemployment tax." (Second Amended Compl., Dkt. No. 27, ¶ 12) (hereinafter referred to as "Compl.").[1] Plaintiffs claim that this "fraud proximately injured plaintiffs by resulting in loss of the employer portion of Medicare and social security contributions (FICA), unemployment benefit contributions." (Compl. ¶ 16.) Plaintiffs also allege that Defendants violated FLSA by failing to pay them overtime. (Compl. ¶¶ 16, 19-20.)

Defendants respond that the Michigan Worker's Compensation Disability Board ("WCDB") has already determined that Plaintiffs are independent contractors and not employees of Defendants and that Plaintiffs are barred by principles of collateral estoppel and/or res judicata from re-litigating that issue, which is necessary to determination of the claims in its Complaint, in this Court. Defendants further respond that the Plaintiffs' complaint fails to adequately allege either the existence of the predicate acts or injury to these Plaintiffs as a result of the alleged predicate acts. Defendants further claim that Plaintiffs' claims are barred by the witness immunity doctrine and that Plaintiffs' FLSA claims fail to plead the prima facie elements of a claim for failure to pay overtime.

---

[1] Plaintiffs filed a Second Amended Complaint on January 13, 2009, adding new material to paragraph 16. The Court will refer to this Second Amended Complaint throughout this Opinion unless specifically noted otherwise.

## A. Meda's Business Structure

Plaintiffs Frank Gifford, Sammy Lewis, Ron McCulloch, Mark Vogelei and Kenneth Marvin Jones painted houses and commercial properties and refinished furniture while working for Defendant Michael Meda doing business as Meda Custom Painting ("Meda"). (Second Amend. Compl. ¶¶ 4, 6.) Defendant Mattei performed accounting services and prepared tax returns for Meda and also assisted Meda with business planning. (Second Amend. Compl. ¶ 8.) All of Meda workers, including Plaintiffs, were required to get their own DBA's[2] before working for Meda, and all workers received 1099's reflecting their compensation. (Second Amended Compl. ¶ 13; Defs.'s Mot. Ex. A, Transcript of Proceedings before the State of Michigan Department of Labor and Economic Growth Workers' Compensation Agency (hereinafter referred to as "Hr'g Tr." 35.)[3] Meda annually submitted a 1040 tax return classifying all workers, including each of the Plaintiffs, as independent contractors under its business structure and did not withhold any amounts from workers' wages and "did not pay unemployment, social security or FICA taxes" with respect to Plaintiffs. (Second Amended Compl. ¶ 13; Hr'g Tr. 35, 37.)

_____

[2] Doing Business As certifications that they were each independent contractors operating their own business entity under their DBA name.

[3] Plaintiffs do not attach the transcript of proceedings before the WCDB to their Complaint but they quote extensively from the transcript in their Complaint and state specifically that crucial allegations in their Complaint "are based, inter alia, on the testimony under oath of Michael Meda on August 29, 2007, in the workers compensation hearing of *Sammy Lewis v UPS*, et al, No. 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 . . . ." Because matters addressed at the hearing are referred to in Plaintiffs' Complaint and are, by Plaintiffs' own allegations in their Complaint, central to Plaintiffs' claims in their Complaint, the Court will consider matters contained in the transcript in ruling on Defendants' Motion to Dismiss. *See Nieman v. NLO, Inc. and NL Ind., Inc*., 108 F.3d 1546, 1555 (6th Cir. 1997) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.") (internal quotation marks and citation omitted).

**B.    Proceedings Before the WCDB on Plaintiff Lewis' Claim for Benefits - The Finding That Lewis was an Independent Contractor and Not an Employee of Meda**

Beginning on June 27, 2005, and continuing intermittently for 10 days until September 22, 2007, a hearing was held before the WCDB, Magistrate Victor A. McCoy presiding, on Plaintiff Lewis' June 8, 2005 Application for Mediation or Hearing under the Michigan Workers' Compensation Disability Act ("WCDA"), in which he alleged that he was injured on May 22, 2002 while working for United Parcel Service ("UPS").  (Hr'g Tr. 1-2, 65.)[4]  Lewis sought to recover medical and disability benefits from UPS and also from the Second Injury Fund/Dual Employment Provisions ("SIF/DEP"), because he claimed that the  injury he sustained while working for UPS also disabled him from working for Meda.  (Hr'g Tr. 2.)[5]  Prior to determining whether SIF/DEP was liable to Lewis under the dual employer provision, the Board had to decide whether Lewis was an independent contractor and therefore not eligible for benefits under the WCDA, or an employee

---

[4] None of the other Plaintiffs in the instant action was involved in the hearing before the WCDB. Indeed none of the Plaintiffs apart from Mr. Lewis claim ever to have been injured or otherwise claim benefits under the WCDA.

[5] The Second Injury Fund is a creature of statute, MCL § 418.372, which provides that if an employee was engaged in more than one employment at the time of an injury covered under the act, the employer in whose employment the injury occurred is liable for all of the employee's medical, rehabilitation and burial benefits but if that employer provided less than 80% of the employee's weekly wage, then the second employer shares in the weekly benefit portion of the employee's total benefits based upon the portion that the second employer represented of an injured employee's total wages. MCL § 418.372(1).  There is no direct recovery under the Workers' Compensation laws against the non-injury employer and thus Meda was not a defendant in the WCDB proceeding. However, an initial determination had to be made that Lewis was an employee of Meda and not an independent contractor, before the SIF/DEP liability would attach.  Accordingly, SIF/DEP vigorously litigated before the WCDB the issue of whether Lewis was an independent contractor or an employee.  For purposes of apportionment under the SIF/DEP statute, "only wages which were reported to the internal revenue service shall be considered, and the reports of wages to the internal revenue service are conclusive for the purpose of apportionment under this section."  MCL § 418.372(2).

of Meda, and therefore eligible for benefit payments by the SIF/DEP.

Following 11 days of testimony, extensive briefing by the parties and closing arguments, the Board concluded, among other issues, that Lewis was an independent contractor, not an employee of Meda, that therefore the SIF/DEP provisions of the WCDA were not implicated, and dismissed the SIF/DEP from the case. (Hr'g Tr. 46-49, 65.) The Board found that Mr. Lewis, d/b/a Custom Painting by Sam, maintained a separate business with its own internet site offering the same services as Meda, that he performed painting services for customers other than Meda and that he was properly classified as an independent contractor relative to his employment with Meda:

> I find that Mr. Lewis, d/b/a Custom Painting by Sam, maintained a separate business offering the same service that he provided to [Meda], specifically, house painting services. . . . Mr. Lewis also argued that he did not hold himself out to the public. He claimed that he did not cause the listings of his business to appear on the internet. He did not dispute that indeed there were listings of his d/b/a on the Internet. Furthermore he did not dispute that he performed *flat fee* jobs for customers other than Meda. Neither did he dispute that he received compensation from his d/b/a and filed taxes relative to his d/b/a. . . . Accordingly I find that Mr. Lewis d/b/a Custom Painting by Sam, held himself out to and rendered the same service to the public, specifically house painting services.

> \*       \*       \*

> Mr. Meda stated that he organized his business in such a fashion because that was the customary way of doing things in his industry, and apparently was the only way he knew to structure his business. This fact persuades me that Mr. Meda intended that there be an independent contractor relationship between his company and Mr. Lewis (despite his later contradictory testimony that he *considered* Mr. Lewis to be an employee). The facts show that Mr. Meda did not want a traditional employer-employee relationship. It also appears that Mr. Lewis was agreeable to this type of arrangement. Mr Lewis did accept the terms of the agreement. Of course, Mr. Lewis retained the option to negotiate a different arrangement outright if the terms were not to his liking. Notably, Mr. Lewis obtained a significant benefit by accepting the arrangement as proposed by Meda. Specifically, he would ultimately be paid more money each week since no payroll taxes were taken out of his pay. Mr. Lewis had more cash in hand as a result of this arrangement.

> \*       \*       \*

While I am concerned that on its face, Meda's business structure could be construed as a *dodge* to avoid not only paying payroll taxes but also more importantly, liability under the WCDA, I cannot overlook the part that plaintiff played in this matter. After all, plaintiff enjoyed a tangible benefit from his arrangement with Meda. I have no doubt that had Mr. Lewis not been injured and the issue of dual employment implicated, he would have continued to work under the same arrangement with Meda to this very day, and continued to enjoy the benefits of his arrangement with Meda. Plaintiff cannot have it both ways.

(Hr'g Tr. 47-49) (emphasis in original.)

Plaintiff Lewis appealed the WCDB's determination to the Michigan Workers' Compensation Appellate Commission ("WCAC") which affirmed the WCDB's finding that Lewis was an independent contractor and that he suffered a compensable low back injury as "supported by competent, material and substantial evidence on the whole record and [ ] free of legal error." (Sammy B. Lewis v. United Parcel Service, Inc. and Liberty Mutual Ins. Co. and Second Injury Fund/Dual Employment Provisions, 2009 WL 1245240, No. 08-0103 at 12 (Mich. Work. Comp. App. Com. April 20, 2009).[6] The WCAC remanded to the WCDB, however, for further findings on the issue of Lewis' disability and on the issue of attorneys' fees. *Id.* One member of the WCAC dissented from the WCDB's conclusion that Lewis was an independent contractor and not an employee of Meda, concluding that the WCDB had made erroneous findings of fact and conclusions of law. *Id.* 12-17 (Ries, Comm'r dissenting). Another member of the WCAC agreed with the WCDB's conclusion but also would have considered whether Lewis had "utilized[d] the internal revenue code in such a way that he is estopped from claiming employee status for workers' compensation purposes." *Id*. 21-22 (Will, Comm'r concurring). As the record before the WCAC

---

[6] While both Plaintiffs and Meda refer to the WCAC decision, neither of the parties attached a copy of the decision. The decision is available on Westlaw and, as with the decision of the WCDB, is central to Plaintiffs' claims and the Court will consider the official decision of the WCAC in deciding Meda's motion to dismiss.

indicated that no such inconsistent deductions were taken by Lewis, indeed it appeared that Lewis

did not file timely returns for the years in question, Commissioner Will concurred that Lewis was

an independent contractor.  *Id.* 22.

## II.     STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state

a claim upon which relief can be granted.  When reviewing a motion to dismiss under Rule 12(b)(6),

a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations

as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487

F.3d 471, 476 (6th Cir. 2007).   But the court "need not accept as true legal conclusions or

unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir.

2000)).  "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State

of Term. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).  In *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide

the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be

enough to raise a right to relief above the speculative level...." *Id.* at 555 (internal citations omitted).

The Supreme Court recently clarified, in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), that:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter,
> accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic
> Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility
> when the plaintiff pleads factual content that allows the court to draw the reasonable
> inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The
> plausibility standard is not akin to a "probability requirement," but it asks for more
> than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a
> complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to relief.'"
> *Id.*, at 557 (brackets omitted).

*Id.* at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969). In addition to the allegations and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir.1997).

## III.   ANALYSIS

### A.   Preclusive Effect of the Decisions of the WCDB and the WCAC

Plaintiffs concede that "the Workers Compensation Agency and the Workers Compensation Appellate Commission (the "WCAC") ruled that plaintiff Lewis, and only Lewis, was an independent contractor." (Pls.'s Resp. Mot. Dismiss 4-5, Ex. 1.) The Opinion and Order of the WCAC confirms this, but Plaintiffs argue, and Meda does not disagree, that the WCAC Order remanded to the WCDB for further proceedings and was therefore not final and not appealable:

"Only a final order of the WCAC may be appealed (by leave) to the court of appeals, Mich Court Rule 7.203(B) and MCL 418.861a(14)." (Pls.'s Mot. Sanctions 6.) Plaintiffs' deny Defendants' assertion, therefore, that Plaintiff "chose" not to appeal the final order of the WCAC.

An initial question presented in Defendants' motion to dismiss, is whether any preclusive effect should be given to the WCDB's finding, affirmed by the WCAC, that Plaintiff Lewis was an independent contractor for purposes of the WCDA. Defendants argue, relying on the allegations of Plaintiffs' Complaint, that all Plaintiffs in the instant matter are similarly situated to Plaintiff Lewis with respect to their employment with Meda and therefore that aspect of the decision of the WCDB, which Plaintiffs concede was affirmed by the WCAC, that Plaintiff Lewis was an independent contractor, is binding on this Court. Defendants argue that therefore Plaintiffs are precluded from re-litigating the issue of their status as independent contractors by the *Rooker-Feldman* doctrine, which Defendants argue defeats Plaintiffs claim in this case that Meda fraudulently misrepresented this employment status to the IRS.

Plaintiffs respond that the decision of the WCAC applies only to Plaintiff Lewis' status and that in any event, *Rooker-Feldman* does not apply to the decision of an administrative agency. Plaintiffs further argue that the issue in the instant matter is not whether Plaintiffs were employees under the WCDA but whether they are employees under the Internal Revenue Code, an issue that was not before the WCDB or the WCAC. (Pls.'s Resp. Mot. to Dismiss 5.)

Defendants' argument that this Court is bound by the WCAC's decision that Lewis was an independent contractor faces several obstacles. *Rooker-Feldman* does not apply to the decisions of a state administrative agency, and alternate theories of preclusion, which can sustain a finding of the preclusive effect of state administrative decisions in some cases, do not support a bar in this case.

1.      ***Rooker-Feldman* Does Not Apply to the Decision of a State Administrative Agency**

Under the *Rooker-Feldman* doctrine, "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 463 (2006). The Supreme Court in *Lance,* and in its prior term in *Exxon Mobil Corp. v. Saudi Basic Ind. Corp.*, 544 U.S. 280 (2005), reined in the use of the *Rooker-Feldman* doctrine by lower federal courts: "In *Exxon Mobil*, decided last term, we warned that the lower courts have at times extended the *Rooker-Feldman* doctrine 'far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738.'" *Lance, supra* at 464 (citing *Exxon Mobil, supra* at 283). Emphasizing the "narrowness" of the doctrine, the Court expressly cautioned that "*Rooker-Feldman* 'has no application to judicial review of executive action, including determinations made by a state administrative agency.'" *Id*. at 464 (citing *Verizon Md. Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 644, n.3, 122 S. Ct. 1753, 152 L.Ed.2d 871 (2002)). The Sixth Circuit, relying on *Verizon, supra,*  has also held that *Rooker-Feldman* does not operate as a bar to federal court review of a state administrative decision. *See Marks v. Tennessee*, 554 F.3d 619, 623 (6th Cir.  2009) ("*Rooker-Feldman* does not apply to judicial review of the OAC's actions- the actions of a state administrative agency.") *But see Immel v. Lumpkin*, No. 07-1214, 2009 WL 173862 (S.D. Ohio Jan. 23, 2009) (unpublished) (holding that *Rooker-Feldman* barred federal court review of a state hearing officer's denial of plaintiff's eligibility for medicaid).

The Court in *Lance* also cautioned that privity principles that may otherwise apply to general preclusion rules have no place in the *Rooker-Feldman* analysis.  Refusing to allow defendant to invoke *Rooker-Feldman* against the plaintiffs in *Lance*, who clearly were not parties to the

underlying state-court action, the Court rejected the district court's finding that defendant was in privity with a party in the earlier state-court matter: "The District Court erroneously conflated preclusion law with *Rooker-Feldman*. Whatever the impact of privity principles on preclusion rules, *Rooker-Feldman* is not simply preclusion by another name. . . . The *Rooker-Feldman* doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." 546 U.S. at 466. The Court in *Lance* left the door open for a possible limited application of *Rooker-Feldman* to a nonparty, specifically hypothesizing a case where an estate might take a *de facto* appeal in federal court of a prior state court judgment involving the decedent. *Id*. at 466 n.2. Although the SIF/DEP may indeed have had substantial identity of interest with Meda on a privity analysis, the instant case likely does not present facts which would compel carving out such an exception to the boundaries of the *Rooker-Feldman* doctrine announced in *Lance. But see McCormick v. Braverman*, 451 F.3d 382, 396 (6th Cir. 2006) (recognizing that *Exxon Mobil* made the case before it a close question but finding that one in privity with a state-court loser could be barred by *Rooker-Feldman* from relitigating issues decided in a prior state court proceeding).

## 2.     Collateral Estoppel

While *Rooker-Feldman* would not apply to the decisions of the WCDB or the WCAC, Defendants' argument merits analysis on alternate preclusion grounds. Collateral estoppel principles can operate to bar federal court review of state administrative decisions in certain instances.[7] The

---

[7] Plaintiffs argue that the Court should not consider Defendants' collateral estoppel argument because it appeared for the first time in Defendants' reply to Plaintiffs' response the Defendants' motion to dismiss. However, the Court considers application of collateral estoppel principles as a necessary corollary to its discussion of Defendants' *Rooker-Feldman* argument.

Full Faith and Credit Clause dictates that a federal court evaluating the preclusive effect of a state court judgment "must refer to the preclusion law of the State in which the judgment was rendered." *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 1331-32 (1985) ("[A] federal court may rely in the first instance on state preclusion laws to determine the extent to which an earlier state judgment bars a subsequent litigation." *Id*. at 1332. *See also Lopez v. Union Carbide Corp.*, 83 F. Supp. 2d 880, 884 (E.D. Mich. 2000) (stating that determination of the preclusive effect of a prior state court judgment is made through application of the preclusion law of the state in which the prior judgment was rendered); *Metzler v. United States*, 832 F. Supp. 204, 207 (E.D. Mich. 1999) ("To determine the preclusive effect of a prior state court judgment, federal courts must apply the preclusion law of the state in which that prior judgment was rendered.")

Generally speaking, preclusion doctrines operate to bring finality to the adjudication of disputes where the same parties have had a previous opportunity to fully and fairly litigate their claims. *Nummer v. Treasury Dep't*, 448 Mich. 534, 541 (1995) citing *Storey v. Meijer, Inc.*, 431 Mich. 368, 372 (1988). In particular, "[f]or collateral estoppel to apply, a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment. In addition, the same parties must have had a full opportunity to litigate the issue, and there must have been mutuality of estoppel." *Nummer*, 448 Mich. at 541. Michigan courts have long recognized that where the party against whom the doctrine is invoked, here Plaintiff Lewis, was a party to the prior proceeding and had a full and fair opportunity to fully litigate the issue, strict identity of parties and mutuality of estoppel are not required: "[T]he lack of mutuality of estoppel should not preclude the use of collateral estoppel when it is asserted defensively to prevent a party from relitigating an issue that such party has already had a full and fair opportunity to litigate in a prior suit." *Monat v. State*

12

*Farm Ins. Co*., 469 Mich. 679, 691-92 (2004).

In Michigan, preclusive effect can be given to an administrative decision if the following factors are present: (1) the administrative decision was adjudicatory in nature; (2) the administrative process allowed for a right to appeal; and (3) the Legislature intended that the administrative decision in question be final absent an appeal. *Nummer, supra* at 542 citing *Senior Accountants, Analysts & Appraisers Ass'n v. Detroit*, 399 Mich. 449, 457-458 (1976) and *Roman Cleanser Co. v. Murphy*, 386 Mich. 698, 703-704 (1972).

In *Lopez, supra,* the court discussed the preclusive effect of a decision of the WCAC. Plaintiff in *Lopez* had filed a claim with the WCDB alleging that he had been exposed to various substances during his employment that caused numerous disabling conditions. The WCDB found, after an extensive hearing, that plaintiff's illness was not associated with his employment. Plaintiff appealed to the WCAC which dismissed the appeal as untimely. Plaintiff appealed this decision to the Michigan Court of Appeals which remanded to the WCAC to consider the substance of the claim. *Id*. at 882. On remand, the WCAC affirmed the WCDB and Plaintiff did not appeal the final order of the WCAC. *Id*.

The court in *Lopez* discussed each of the principles of preclusion set forth above, and concluded that collateral estoppel applied to preclude relitigation of the issue of whether the disease was work-related because: (1) an issue of fact essential to the judgment (whether plaintiff suffered from a work-related disease) had been fully and fairly litigated before the Board between the same parties; (2) the administrative process allowed for a right to appeal (both the Michigan Constitution, Article 6, Section 28 and the WCDA MCL § 418.861a authorize judicial appellate review); and (3) the Legislature intended to make the opinions of the Bureau and Commission final absent an appeal

(MCL § 418.274(8) provides that the decision reached by a majority of the 3 member panel shall be the final decision of the commission).  83 F. Supp. 2d at 884-886.

Two critical facts distinguish the instant case from *Lopez*: (1) the court found that the plaintiff in *Lopez* had made an affirmative choice not to pursue his right to appeal the final order of the WCAC (Plaintiffs in the instant case assert that the order of the WCAC is not yet final and appealable); and (2) the issue which plaintiff in *Lopez* was estopped from relitigating in federal court was an issue of fact, not an issue of law.  The issue of Lewis' status as an employee or an independent contractor is treated as one of law by Michigan courts.  "Whether an individual is an employee as defined by the WCDA presents a question of law subject to review de novo." *McCaul v. Modern Tile and Carpet, Inc*., 248 Mich. App. 610, 615 (2002).

Michigan courts hold that findings of fact of the WCAC are conclusive on appeal absent fraud but issues of law are subject to de novo review by a court on appeal.  *McCaul, supra* at 614.  This Court is bound to follow Michigan preclusion law, which in this case would not give preclusive effect to the WCAC's conclusions of law.  *See Noyes v. Channel Pdcts., Inc.*, 935 F.2d 806, 809 (6th Cir. 1991) (holding that federal court must accord factual findings of a state agency the same preclusive effect as they would receive in that state's courts, which would not give preclusive effect to a mixed question of fact and law).  *See also In Re Glaspie*, 410 B.R. 261 (E.D. Mich. 2007) (affirming bankruptcy court's decision to give collateral estoppel effect to the WCDB's findings of fact, but not giving such effect to the WCDB's conclusions of law).

Defendants' collateral estoppel argument, even if it could be construed to find support in the applicable law, would only operate to bar reconsideration of the narrow issue decided by the WCDB, i.e. that Plaintiff Sammy Lewis was an independent contractor and not an employee as that term is

defined under the WCDA. Plaintiffs assert that this issue, even if it were given collateral estoppel effect, is not the same issue that is before this Court, i.e. the classification of these Plaintiffs as employees or independent contractors under the Internal Revenue Code.

Plaintiffs are correct in their assertion that the definition of an employee for purposes of the federal taxation is a different inquiry than employee status under the WCDA. In his dissenting opinion in Plaintiff Lewis' case before the WCAC, Commissioner Ries discussed the significance of the different standards for classifying an employee under the federal tax laws and the Michigan workers compensation laws. Commissioner Ries disagreed with the majority opinion of the appellate commission that Lewis was an independent contractor. Commissioner Ries criticized the lead opinion for relying too heavily on Lewis' classification as an independent contractor on his tax returns, and insisted that the record showed that Lewis was in fact an employee as defined in the WCDA. (WCAC Op. 13.) "Ultimately, the question of whether plaintiff is an employee for tax purposes is a question of federal law and the question of whether plaintiff is an employee for the purposes of the Michigan Worker's Disability Compensation Act is a question of state law. That the two separate sovereign jurisdictions might use different criteria to answer the question can hardly be doubted. . . . The federal standard is markedly different from the statutory standard applicable here. . . . [I]t is simply not so inconsistent that one might make a different representation to the federal taxing authorities than one would make to a state administrative agency. For this reason, one cannot utilize a party's representation to the laws of one sovereign jurisdiction as dictating the result under the laws of a different sovereign jurisdiction; different laws applied to the same set of facts may have a different result." (WCAC Op. 16-17) (citing *Peno Trucking, Inc. v. Comm'r of Internal Revenue*, No. 07-1869, 2008 WL 4463765 (6th Cir. Oct. 3, 2008).

Accordingly, although Defendants strongly urge this Court to give some type of preclusive effect to the narrow issue decided by the WCDB, and affirmed in a non-final decision of the WCAC, that Plaintiff Lewis was an independent contractor under the WCDA, the issue Plaintiffs present to this Court, i.e. Plaintiffs' status under the Internal Revenue Code, was not decided by the WCDB. Even if this Court were to conclude, which it does not, that the issue decided by the WCDB was somehow significant to its decision in the instant case, it would be appropriate to stay this case pending the conclusion of proceedings before the WCDB and WCAC. *See Lopez, supra* at 881 (the court staying the case pending the conclusion of the proceedings before the Michigan Bureau of Workers' Disability Compensation and any appeals therefrom).[8]

## B.    Plaintiffs' RICO Claim

Plaintiffs' RICO claim rests upon the allegation that Defendants misclassified Plaintiffs as independent contractors, rather than employees, and thereby deprived Plaintiffs of the employer portion of contributions required under the Federal Insurance Contributions Act ("FICA"), 26 U.S.C. § 3101, *et seq.*, which Defendants would have been obligated to pay on Plaintiffs' behalf had Plaintiffs been properly classified as employees.  (Compl. ¶ 9 - alleging that the RICO enterprise existed for the purpose of defrauding Plaintiffs of their FICA payments; Compl. ¶ 12 - alleging that the defendants fraudulently classified their workers as independent contractors and "did not withhold income taxes or FICA (social security and Medicare), and unemployment tax;" Compl. ¶ 16 - alleging that Plaintiffs were injured by "the loss of the employer portion of Medicare and social security contributions (FICA), [and] unemployment benefit contributions.").  The essence of

---

[8] Because this Court concludes that this finding of the WCDB is not relevant to its resolution of the issues presented in the instant Complaint, it does not address the issue of Witness Immunity raised by the Defendants in their Motion to Dismiss.  (Mot. Dismiss 3-6.)

Plaintiffs' claim is summarized in the Complaint as follows:

> Meda and Meda Painting fraudulently classified their employees, including the plaintiffs, as "independent contractors," and did not withhold federal withholding income taxes or FICA (social security and Medicare), and failed to pay to the United States government the employer portion of FICA (social security and Medicare), and unemployment tax. The plaintiffs were in fact employees and not independent contractors, and Meda and Mattei knew they were employees and intended to evade federal and state taxes by classifying the workers as independent contractors. Mattei assisted in the scheme to defraud by advising Meda and Meda Painting that it was permissible for them to pay their workers as independent contractors when Mattei knew they were employees, and by doing tax returns yearly for Meda and Meda Painting in which Meda and Meda Painting knew the workers were employees; as a result of this advice and work by Mattei, Meda and Meda Painting did not withhold and pay federal and state income tax and the employee's share of FICA (Social Security and Medicare), and did not pay the employer's share of FICA or unemployment taxes.

Compl. ¶ 12. Plaintiffs do not describe how they were injured by this scheme to defraud (a failing discussed more thoroughly further in this Opinion) stating only that: "Defendants' fraud proximately injured plaintiffs resulting in loss of the employer portion of Medicare and social security contributions (FICA), and unemployment benefit contributions." (Compl. ¶ 16.)[9] In their response to Defendants' motion to dismiss, Plaintiffs elaborate a bit on this alleged injury: "This is an allegation of injury to 'property.' Plaintiffs allege they lost social security retirement credits, unemployment credits and Medicare credits due to Meda's fraudulent failure to pay into FICA for them. The damages are concrete. They are measurable, by the amounts Meda as employer was

---

[9] It is unclear what Plaintiffs are claiming when they refer to "unemployment benefit contributions." The Court assumes that Plaintiffs refer to both FICA and to the Federal Unemployment Tax Act ("FUTA"), both being "employment taxes" under the IRC. The same analysis which applies to Plaintiffs' theories regarding FICA would apply to any claims being asserted that would fall within purview of FUTA. *See Bendsen v. George Weston Bakeries Distribution Inc.*, No. 4:08-50 JCH, 2008 WL 4449435 at * 4 (E.D. Missouri Sept. 26, 2008) (unpublished) (recognizing that the majority of courts considering whether FICA and FUTA create a private right of action have correctly concluded that they do not).

obligated to pay on behalf of employees into FICA (about 7.5% of gross wages)."[10]  (Pls.'s Resp. 10.)

The gravamen of the Complaint is that Defendants' failed to abide by their statutory duty under FICA to classify Plaintiffs as employees and to withhold employment and income tax amounts accordingly. Regardless of how Plaintiffs frame their claim, a finding that Defendants misclassified Plaintiffs as independent contractors for tax purposes is essential to Plaintiffs' theory and the resolution of such employee misclassification claims has been firmly vested in the comprehensive administrative enforcement scheme embodied in both the Internal Revenue Code ("IRC"), 26 U.S.C. § 1 *et seq.* and the Social Security Act ("SSA"), 42 U.S.C. § 301 *et seq.*   The availability of this comprehensive scheme forecloses Plaintiffs' attempt to create a RICO claim notwithstanding the presence of this well-established administrative network of resolution and relief.

1.      **The IRC, FICA and the SSA set forth an exclusive enforcement mechanism for the resolution of employee misclassification claims that forecloses Plaintiffs' RICO claim.**

        a.      **The underlying regulatory and statutory system for review of employee misclassification claims is exclusive and does not allow for a private right of action.**

_____

[10] Plaintiffs do not explain how Meda's failure to pay FICA taxes resulted in harm to them but appear to claim that if Meda had classified them as employees, Meda would have been required to pay 7.5% (the employer's share of FICA) into FICA on their behalf.  As independent contractors, if they filed tax returns appropriately for the years in question, they would have been required to pay 15.3% under the Self-Employed Contribution Act ("SECA") and therefore the misclassification would have cost them approximately 7.5% of their gross wages (the amount of the employer contribution).  As will be discussed later in this memo, there is a significant question whether there is actually a net financial loss to Plaintiffs, assuming that they filed their tax returns as independent contractors and took the deductions available to them as independent contractors.  Regardless of the ultimate financial outcome of the alleged misclassification, the determination of whether Plaintiffs were improperly classified as independent contractors by Meda, the heart of their claim, is an issue which should be determined under the comprehensive administrative framework set forth in the FICA and the SSA.

"When an employer misclassifies an employee as an independent contractor, should that employee have the right to sue his employer for failing to withhold and remit payroll taxes to the federal government or should the employee be limited to administrative remedies?" J. Aaron Ball, *The Sea Clammers Doctrine: Reeling In Private Employment Tax Claims In Worker Misclassification Cases*, 1 DePaul Bus. & Com. L.J. 215 (2003). The vast majority of cases that have decided this issue, as well as the Ball article, conclude that the exhaustive regulatory scheme embodied in the IRC, FICA and the SSA for resolution of employee classification claims forecloses a private right of action for such claims under either statute.

In *Salazar v. Brown*, 940 F. Supp. 160 (W.D. Mich. 1996), plaintiffs were agricultural workers who brought a claim against their employer under FICA, alleging that their employer had treated all workers as independent contractors, when in fact they were employees, issuing each worker a 1099 and not W-2 forms and not withholding any taxes nor withholding or paying any FICA taxes – the identical claim made by Plaintiffs (under RICO not FICA) in the instant case. The court held that no private right of action could be inferred under FICA for such claims and discussed the intricacies of the federal social welfare programs, concluding that employees who challenged their classification as employees or independent contractors were limited to pursuing claims through the administrative scheme, which more than adequately protects both workers and employers who suffer losses as a result of a worker's misclassification. Outlining the administrative scheme, the court explained:

> The Federal Insurance Contributions Act (FICA) is but one part of the immensely complicated and interrelated system of statutes and regulations that make up the federal social welfare program. The Social Security Act, 42 U.S.C. §§ 401, *et seq*., establishes a federal insurance scheme for the benefit of the aged, blind and disabled and their dependents. FICA is one of the taxing statutes designed to fund the program set up by the Social Security Act. Pursuant to the requirements of FICA,

> employees and their employers are liable for certain employment taxes to support the Social Security and the Medicare systems. . . . Federal law requires the employer to collect from each employee the FICA tax on wages by withholding the taxes from the employee's paycheck and periodically remitting them to the Internal Revenue Service. *See* 26 C.F.R. § 31-3102-1(a). Federal law also imposes upon the employer itself a tax, generally in an amount equal to the employee's tax. 26 U.S.C. § 3111(a). This tax is specifically denominated as an "excise tax" in the Act. *Id.* Consequently, an employer is required to withhold and remit the employee tax and to remit an equal amount as an employer excise tax on the covered wages of all persons who qualify as "employees," as that term is defined by FICA. 26 U.S.C. § 3121(d).

940 F. Supp. at 162-163. Self-employed workers are covered by different provisions and are required to submit their own taxes to the IRS, subject to tax under a separate taxing provision, the Self Employed Contributions Act ("SECA"). 26 U.S.C. §§ 1401, 1402(b); 940 F. Supp. at 163. "The obligations imposed by FICA are administered by the Internal Revenue Service and are subject to numerous regulations, revenue rulings, interpretive rulings, and other administrative pronouncements . . . ." *Id.* Employer returns are subject to audit by the IRS for compliance with FICA and the IRS can assess the employer for non-compliance and the employer can contest the assessment in federal court. *Id.* Significantly, "a worker's entitlement to social security benefits does not depend on the actual payment of FICA taxes by the employer. FICA, by its terms, is a taxing statute, designed to fund the government's overall obligations in the areas of old-age, disability, survivors, and Medicare insurance. The worker's entitlement to social security benefits is measured by the worker's actual receipt of covered wages, not on the reporting of income or the payment of FICA taxes." *Id.* at 163.

Workers who feel aggrieved by an employer's classification of their employment status can seek relief through the provisions of the SSA:

> The Social Security Act creates an express administrative remedy for employees who contend that earnings have not been credited properly to their record for social security purposes. An employee seeking to establish that he has earned wages that

should be credited to his account for social security purposes must proceed administratively before the Secretary of Health and Human Services to correct the employee's earnings record within three years, three months and fifteen days of the year in question. 42 U.S.C. § 405(c)(4), (5). The agency will investigate the requested correction and make any necessary changes. 20 C.F.R. §§ 404.8020.823. If the worker is not satisfied with the Secretary's resolution of this issue, judicial review is available in the federal district court. 42 U.S.C. § 405(c)(8). The employer is neither a necessary or proper party in such proceedings, although the employer's records may be subpoenaed to provide evidence on the issue. 42 U.S.C. § 405(d).

940 F. Supp. at 163. Thus, the administrative scheme provides for an avenue of relief for aggrieved employees as well as an enforcement mechanism for the government, sometimes over-utilized by the IRS in its "pursuit and assessment of taxes and penalties . . . against employers who, in good faith, had misclassified their employees as independent contractors." *Id.* at 164 (citation omitted). Concluding that a private cause of action could not be inferred under FICA, the *Salazar* court concluded:

As should be obvious from the foregoing analysis of FICA and the Social Security Act, neither the language nor the structure of either act even remotely evinces an intent to create a private cause of action as plaintiffs suggest. To the contrary, Congress has established a comprehensive administrative system to handle the very claims that plaintiffs seek, improperly, to bring in court. The Social Security Act creates an express administrative mechanism to investigate and decide issues concerning a worker's earnings record and his receipt of covered wages. 42 U.S.C. § 405(c)(4), (5). This mechanism is superintended by the Social Security Administration, the largest adjudicatory body on the face of the earth, and provides the safeguards of an adversary hearing before a professional Administrative Law Judge and eventual judicial review. Likewise, the enforcement of FICA tax obligations is entrusted to the IRS, which has administrative and judicial remedies directly against the employer and corporate officers. These statutes do not admit of a third approach, under which employees and employers would litigate benefit and taxation issues outside the statutory structure and without the presence of the very agencies created by Congress to administer this complicated system.

940 F. Supp. at 164. The court concluded that the Sixth Circuit, if presented with the issue, would refuse to find a private right of action where the statute does not expressly create one, given the extensive administrative scheme and availability of remedies. *Id.* at 166.

The Eleventh Circuit came to a similar conclusion, foreclosing a private right of action under FICA, in *McDonald v. Southern Farm Bureau Life Ins. Co.*, 291 F.3d 718 (11th Cir. 2002). Plaintiffs in *McDonald*, a group of independent insurance agents, made the same claim as Plaintiffs make in the instant case, that their employer wrongfully classified them as independent contractors rather than employees, alleging a violation of FICA (not RICO). Analyzing the issue, as the court did in *Salazar, supra*, under the test set forth by the Supreme Court in *Cort v. Ash*, 422 U.S. 66 (1975), the *McDonald* court found that the extensive administrative remedies belied any intent on the part of Congress to allow for private suits: "Congress has established a comprehensive regulatory scheme including numerous administrative procedures that allow individuals in McDonald's position to seek relief. . . . [A]llowing private lawsuits under the statute would undermine the administrative procedures that have been expressly created in order to assist workers who feel that they have been assessed improper FICA taxes." 291 F.3d at 725. The court noted, as the court did in *Salazar*, that as long as an employee properly reports his income, he qualifies for social security benefits regardless of whether his employer complied with FICA requirements. *Id.* at 724. It is completely irrelevant whether or not his employer has paid his FICA share or not, if the employee can be properly classified and has reported his income, he will qualify to receive social security benefits. The court was not persuaded by McDonald's argument that the administrative remedies did not provide the class action injunction relief he was seeking and only allowed refunds going back three years. "This argument fails, as we cannot imply a private right of action merely because a statute's administrative scheme does not satisfy all of a litigant's preferred remedies." *Id.* at 726 n. 1.

      **b.**      **Extensions of the no right of private action under FICA**

Courts which have concluded that FICA does not provide a private right action have also held that related non-statutory claims, based upon the same misclassification theory, are also foreclosed. Noting its agreement with the *Salazar* court that no private right of action was available to the plaintiffs under FICA, the court in *McElwee v. Wharton*, 19 F. Supp. 2d 766, 771 (W.D. Mich. 1998) also foreclosed plaintiff's attempt to proceed on an equitable theory of restitution:

> Although Plaintiff wishes to proceed on an equitable theory of recovery rather than under a statute, the rationale in *Salazar* applies equally to a restitution claim. Namely, as in *Salazar*, there is no need to recognize a new equitable theory of recovery where the Plaintiff has available other remedies to redress his alleged losses. First, as noted in *Salazar*, the employee may pursue an administrative action under the Social Security Act inasmuch as the employee characterization affects rights to retirement benefits. *See, e.g., Jabar v. Secretary of Health & Human Services*, 855 F.2d 295 (6th Cir. 1988). Second, the employee may urge the Internal Revenue Service to enforce the legal obligations of the employer to pay the taxes. Third, the employee who has mistakenly paid SECA taxes which were not due may administratively claim a refund from the Internal Revenue Service under 26 U.S.C. § 6511(a). If and when the claim for a refund is denied, the individual may sue for the refund pursuant to 28 U.S.C. § 1346(a). *See, e.g. David v. United States*, 551 F. Supp. 850, 852 (C.D. Cal. 1982); *see also Ware v. United States*, 67 F.3d 574, 575 (6th Cir. 1995). In light of the available legal remedies, there is no need to recognize an equitable right for restitution as to federal employment taxes.

19 F. Supp. 2d at 771. Employing this same logic, several courts, following the conclusion that FICA does not provide a private right of action, have also dismissed associated state law claims (alleging, for example, breach of contract or unjust enrichment) finding that they are foreclosed by the comprehensive tax refund scheme. *See Crouch v. Guardian Angel Nursing, Inc.*, No. 3:07-cv-00541, 2009 WL 3738095 at * 5-7 (M.D. Tenn. Nov. 4, 2009) (unpublished) (recognizing that the Sixth Circuit has not been called upon to address the issue but agreeing with the overwhelming majority of courts that have found no available cause of action for misclassification claims, noting that "permitting [plaintiff's] suit to proceed . . . would interfere with the IRS's administrative scheme for handling such disputes . . . . Individuals would have less incentive to follow IRS

procedures if they could simply bring common-law claims for misclassification as an independent contractor in state court (or in federal court sitting in diversity.")) (quoting *Umland v. PLANCO Financial Services, Inc*., 542 F.3d 59 (3d Cir. 2008) which held that plaintiff's unjust enrichment claim based on misclassification was preempted by federal tax law). *See also Oplchenski v. Parfums Givenchy, Inc.*, No. 05-6105, 2007 WL 495289 at * 3-4 (N.D. Ill.  Feb. 12, 2007) (unpublished) (finding no private right of action under FICA and dismissing plaintiff's state wage law and federal common law breach of contract claims that were based on the misclassification claim).

> **c.**     **The presence of this exclusive administrative remedial scheme forecloses Plaintiffs' RICO claim.**

Plaintiffs' attempt to convert their dispute over their entitlement to a certain classification under the federal tax reporting laws into a RICO claim is foreclosed by the extensive administrative scheme that exists to address this very issue.  Several cases have decided this issue and have held that where there exists a comprehensive statutory scheme, that does not provide for a private right of action, a plaintiff cannot create a RICO claim out of a matter that would otherwise be exclusively addressed by that administrative scheme.

In perhaps the most analogous of these cases, *Danielsen v. Burnside-Ott Aviation Training Center, Inc*., 941 F.2d 1220 (D.C. Cir. 1991),[11] employees of various Navy aircraft maintenance contractors brought a RICO claim against their employers and related individuals alleging that the

---

[11] The district court in *Danielsen* used the term "preemption" to describe how the administrative scheme took precedence over the RICO claim. *Danielsen*, 746 F.Supp. at 176. On appeal, the D.C. Circuit said the issue is best described as one of exclusive remedy rather than preemption but added that the label is not critical. *Danielsen*, 941 F.2d at 1226-27.  While the cases discussed in this section address the issue both in terms of preemption and exclusive remedy, this Court agrees with the D.C.Circuit that the "task is more accurately described as determining whether there is a statutory provision of an exclusive remedy rather than the preemption of an entire field."  941 F.2d at 310.

employers had misclassified the workers as "technicians" when they should have been classified as "aircraft workers," the latter group entitled to earn a higher wage. *Id*. at 1225-26. The employees claimed that the predicate acts were mail and wire fraud which consisted of entering into the contracts and using the mails and wires in furtherance of the contracts. *Id.* at 1226. The employee's claims were cognizable under the Service Contract Act, 41 U.S.C. § 351 (the "SCA") which specifically addresses wage and other issues of workers under federal or federally assisted contracts. *Id*. at 1223. The statutory scheme involved multiple levels of administrative review of claims and numerous regulations relating to the methodology by which wage classification determinations were to be made. *Id.* The court first analyzed, under the *Cort* principles discussed above, whether a violation of the SCA gave rise to a private right of action. *Id*. at 1227-28. The court concluded, agreeing with a prior holding of the Ninth Circuit, that "implication of a private right under the SCA would undercut the specific remedy prescribed by Congress." *Id*. at 1228. From this conclusion, the court went on to hold that the exclusive remedy embodied in the SCA scheme also did not allow for a civil action under RICO:

> [W]hat plaintiff will pursue his administrative remedies under the Act where more direct and expeditious relief is available in a private suit? How much more the case where plaintiffs couch their complaint in terms of RICO to give them, not a remedy equal to that provided under the SCA, but three times that remedy? How much more still where their attorneys would be extracting their fees not from their clients but from the other side? Thus, the ingenious pleading of the action in RICO terms rather than in straight SCA language cuts against the implication of the right of action rather than in its favor.

941 F.2d at 1228 (citing *Miscellaneous Service Workers, etc. v. Philco-Ford Corp.*, 661 F.2d 776 (9th Cir. 1981)). The *Danielsen* court concluded that merely labeling a violation of the SCA as pattern of racketeering does nothing to support the argument for a private right remedy. *Id*. at 1229.

In *McCulloch v. PNC Bank Inc*., 298 F.3d 1217 (11th Cir. 2002) the court came to the same

conclusion analyzing claims cognizable under the Higher Education Act ("HEA"). Parents of

college-bound students brought claims under HEA and RICO against lenders and marketers of

student loans who allegedly failed to disclose that there were alternative lending arrangements

available to students whose parents did not qualify for federal parent loans. The court first discussed

the comprehensive administrative scheme available to plaintiffs to remedy their claims and

concluded, again applying the *Cort* principles discussed above, that a private right of action does

not exist under HEA. *Id*. at 1220-1225. The court turned to plaintiffs' RICO claims which alleged

that the failures to disclose the availability of alternate loan options constituted mail and wire fraud,

and concluded that the RICO claims were similarly foreclosed:

> Plaintiffs' mail and wire fraud claims are nothing more than purported HEA
> violations pled in RICO terms. Thus, since Congress did not intend for Plaintiffs to
> have a private right of action against lenders for the failure to disclose Stafford Loan
> information, and instead provided administrative remedies, it follows that Congress
> could not have intended for that same failure to disclose to constitute a violation of
> the mail and wire fraud statute.

298 F.3d at 1226-27. The court relied on the Eleventh Circuit opinion in *Ayres v. General Motors*

*Corp*., 234 F.3d 514 (11th Cir. 2000), where the court found that violations of the National Traffic

and Motor Vehicle Safety Act could not serve as the basis for the predicate acts for a RICO claim.

In *Ayres,* the court concluded that the administrative remedies and lack of private right of action

under the Safety Act made clear "that Congress did not intend to equate a violation of the Safety

Act's notification requirements in and of itself with the felony of mail or wire fraud." 234 F.3d at

522. Finally, citing the court's decision in *Danielsen, supra,* the *McCulloch* court held: "[I]n light

of the HEA's enforcement scheme, granting the Secretary of Education exclusive authority to

remedy violations of the HEA, and the fact that the HEA does not confer a private right of action,

the Court finds that the failure to disclose Stafford Loan information, even if in violation of the

HEA, cannot form the basis for a civil RICO claim seeking treble damages and injunctive relief." 298 F.3d at 1227. *See also Bodimetrics Health Servs., Inc. v. Aetna Life &* Casualty, 903 F.2d 480, 486-487 (7th Cir. 1990) (holding that RICO claims were foreclosed by the exclusive benefits determination process of the Social Security Act); *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637 (2d Cir. 1989) (relying on *Danielsen*, *supra*, finding that the Energy Reorganization Act provides the exclusive remedy for violations of its proscriptions and dismissing plaintiffs' RICO claim, cautioning that "artful invocation of controversial civil RICO, particularly when inadequately pleaded, cannot conceal the reality that the gravamen of the complaint herein is section 210 harassment."); *Bridges v. Blue Cross and Blue Shield Assoc*., 935 F. Supp 37, 41-43 (D.D.C. 1996) (holding that the comprehensive administrative remedy scheme embodied in the Federal Employee Health Benefits Act ("FEHBA") left no room for a remedy under RICO: "the broad enforcement and oversight powers of the OPM established in the statute indicate that the exclusive remedy for an action cognizable under the FEHBA lies under the FEHBA, not under another federal statute."); *Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594, 600-601 (D.N.J. 2000) (relying on the reasoning of *Danielsen, supra,* finding that the Davis-Bacon Act contained a detailed administrative scheme which was the exclusive remedy for alleged underpayment of wages claims for work performed on federal construction projects, and dismissing plaintiffs' RICO claims based on alleged violations of the statute); *Beatty v. North Central Co.,* 170 F. Supp. 2d 868, 875 n.3 (D. Minn. 2001) (implying, but not deciding, that plaintiff cannot base its RICO claim on violation of a statute (FICA or FUTA) that does not provide a private right to sue).

Each of these courts focused on the depth and breadth of the administrative scheme and its remedial provisions. The comprehensive social welfare program embodied in the SSA and the IRC

foreclosures Plaintiffs' claim in the instant case: (1) Plaintiffs may pursue an action under the SSA to the extent that the alleged mischaracterization affects rights to retirement benefits and judicial review of this determination in the district courts is available (*see* 42 U.S.C. § 405(c)(4), (5), (8); *Salazar, supra* at 174, *McElwee, supra* at 171); (2) If Plaintiffs have overpaid under SECA as a result of the mischaracterization they can seek a refund and if their claim is denied they can seek review in district court (*see* 26 U.S.C. § 6511(a); 28 U.S.C. § 1346(a)); (3) Plaintiffs may seek a determination of their employment status by filing a form SS-8, although this is not a prerequisite to relief on a misclassification claim, and may file a Form 8919 for "Uncollected Social Security and Medicare Tax on Wages" (available at http://www.irs.gov./pub/irs-pdf/f8919.pdf).[12] "These statutes

---

[12] In their supplemental brief, Plaintiffs completely fail to address this comprehensive social welfare network and simply state, with no citation to authority, that "Congress has denied regulatory authority to the IRS over the issue of who is an independent contractor and who is an employee, by section 530 of the Revenue Act of 1978. Thus, this court has jurisdiction." (Pls.'s Supp. Br. 6.) Section 530 is a safe harbor provision for employers who are found to have improperly classified their employees as independent contractors, giving employers some relief if they had a reasonable basis for not treating workers as employees. Plaintiffs do not explain how section 530 applies to or controls the issue of exclusive administrative jurisdiction over Plaintiffs' misclassification claims. Plaintiffs rely on an irrelevant Eleventh Circuit case, *Taffet v. Southern Co*., 930 F.2d 847 (11th Cir. 1991) and fail to point out that this case was reversed on rehearing, *Taffet v. Southern Co*., 967 F.2d 1483 (11th Cir. 1992), and the judgment of the district court, dismissing plaintiffs' RICO claims, affirmed.

Completely ignoring, or perhaps completely unaware of, the comprehensive regulatory scheme available to redress misclassification claims, Plaintiffs imply in their supplemental brief that Form SS-8 is the only tool available to an employee who claims to have been misclassified and that the SS-8 results in a non-reviewable technician's determination as to employee status. (Dkt. No. 31, Pls.'s Supp. Br. at 3-6.) First, as discussed at great length above, the administrative scheme for redressing employee misclassification claims is extensive and not in any way dependent on an SS-8 determination notice. Second, as pointed out by Defendants in their supplemental brief, employee classification determinations have routinely been reviewed by the Tax Court and ultimately by the circuit courts. *See e.g. Peno Trucking, Inc. v. Comm'r of Internal Revenue*, 296 F. App'x 449 (6th Cir. 2008) (unpublished) (noting that it reviewed the tax court's legal rulings *de novo* and its factual findings under the clearly erroneous standard on an employee classification claim); *Orion Contracting Trust v. Comm'r of Internal Revenue*, No. 20633-04, 2006 WL 2773883 (U.S. Tax Ct. Sept. 27, 2006) (unpublished) (holding that Tax Court has jurisdiction to consider taxpayer's

28

do not admit of a third approach, under which employees and employers would litigate benefit and taxation issues outside the statutory structure and without the presence of the very agencies created by Congress to administer this complicated system." *Salazar, supra* at 164.

The conduct complained of in the instant case, i.e. the misclassification of Plaintiffs as independent contractors for purposes of federal income and employment tax reporting, is unlawful only by virtue of the federal income tax laws. Thus, Plaintiffs' RICO claim, based upon allegations of mail and wire fraud in furtherance of Defendants' conduct in allegedly misclassifying Plaintiffs, rest upon a finding that Defendants' conduct was illegal under the federal tax reporting laws. "Bluntly put, no matter how you cut the complaint, the only conceivable 'fraud' is the deprivation of plaintiffs' rights under the [tax law]. Since defendants' liability, under the mail and wire fraud statutes, if any, is wholly dependent on the [tax laws], judgment of defendants' conduct lies exclusively with the [IRS and the SSA]." *Butchers Union Local No. 498 v. SDC Investment, Inc*., 631 F. Supp. 1001, 1011 (E.D. Cal. 1986) (holding that plaintiffs' RICO claims, which were based upon conduct which otherwise fell within the exclusive jurisdiction of the NLRB, were pre-empted by the labor laws).

This Court rejects Plaintiffs' attempt to bypass the remedies available under the comprehensive social welfare program outlined above in favor of a treble damage claim, with the prospect of attorneys' fees, under RICO. In the instant case, the comprehensive administrative scheme embodied in the IRC and the SSA leaves no room for a private action based upon a violation of FICA masquerading as a RICO claim. Enforcement of FICA tax obligations has been

---

challenge to a notice of determination).

entrusted by Congress to the IRS and the Social Security Administration, both of which provide

comprehensive administrative and judicial remedies. *See Salazar, supra* at 164. Because Plaintiffs'

sole remedies are those provided by the framework embodied in the SSA and the IRC, Plaintiffs'

RICO claims are dismissed.[13]

## 2.      The Substance of the RICO Claim[14]

---

[13] Even if this Court were to conclude that Plaintiffs' RICO claims survived Defendants' motion to dismiss, it would be compelled to stay proceedings on the basis of the primary jurisdiction of the IRS and the Social Security Administration over Plaintiffs' misclassification claim.  The threshold requirements for application of the primary jurisdiction doctrine are met here.  First, this Court would have jurisdiction over Plaintiff's RICO claims which arise under federal law.  *See Moon v. Harrison Piping Supply, et al.*, 375 F. Supp. 2d 577,  (E.D. Mich. 2005), *aff'd in part, rev'd in part*, 465 F.3d 719 (6th Cir. 2006).  Second, the adjudication of Plaintiffs' RICO claims, i.e. that Defendants engaged in an unlawful pattern of racketeering activity to deny Plaintiffs benefits ("social security retirement credits, unemployment credits and medicare credit due to Meda's fraudulent failure to pay into FICA for them") hinges on a determination of whether they were legally entitled to those benefits in the first instance, i.e. whether they were in fact misclassified.  Indeed, Plaintiffs concede that the issue before this Court is the status of Plaintiffs as employees under the Internal Revenue Code: "This case involves whether Mr. Lewis (and the other Plaintiffs) were employees *under the Internal Revenue Code.*"  (Pls.'s Resp. Mot. Dismiss 5.) (emphasis in original).  Third, the Legislature commits the determination of Plaintiffs' entitlement to those benefits, i.e. whether they should have been classified as employees for purposes of FICA withholding, to the special competence of the IRS and the SSA.  The SSA, in concert with the IRS, is uniquely empowered under the statutory scheme discussed above to answer that question and to provide a remedy.

Invoking the doctrine of primary jurisdiction is particularly appropriate where, as here, the predicate acts of the RICO claim are wrongful only by virtue of a federal statute - here the federal tax laws.  *See Tamburello v. Comm-Tract Corp.*, 67 F.3d 973, 938 (1st Cir. 1995) (holding, in the context of a claim involving a determination by the National Labor Relations Bureau, that "because plaintiff's claim hinges upon a determination of whether an unfair labor practice has occurred, we conclude that his RICO claims are subject to the primary jurisdiction of the NLRB.").  In the instant case, if in fact Defendants are found not to have misclassified Plaintiffs for purposes of the federal tax laws, Plaintiffs predicate act claims, which are wholly dependent on such a finding, are extinguished.

[14] This Court need not reach the substance of Plaintiffs' novel RICO claim because it dismisses Plaintiffs' claims based on the exclusive administrative jurisdiction of the IRS and SSA over Plaintiffs' claims.  However, the Court concludes that Plaintiffs' RICO claim additionally fails to allege crucial elements necessary to sustain a § 1962(c) claim.

The elements of a cause of action under 18 U.S.C. § 1962(c) are: 1) the conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity. *Sedima v. Imrex*, 473 U.S. 479, 496 (1985). Crimes that constitute "racketeering activity" are commonly referred to as "predicate acts" and include, among others, "any act which is indictable under any of the following provisions of title 18, United States Code . . . Section 1341[18 U.S.C. § 1341] (relating to mail fraud), section 1343 [18 U.S.C. § 1343] (relating to wire fraud)." 18 U.S.C. § 1961(1). Plaintiffs in the instant case claim that Defendants engaged in the racketeering activities, or predicate acts, of mail and wire fraud. (Compl. ¶ 13.)

"In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation. As the Seventh Circuit has stated, this standing requirement recognizes that "[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." *Id*. at 496-497 (quoting *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 398 (1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437)).

Defendants claim in their motion to dismiss that Plaintiffs have (1) failed adequately to allege the predicate acts of mail and wire fraud because there is no allegation that Defendants intended to defraud Plaintiffs; (2) failed adequately to allege that they were injured by the alleged predicate acts because they accepted their designation as independent contractors and presumably filed their taxes and took deductions accordingly; and (3) failed adequately to allege that they relied

on the allegedly fraudulent communications.[15]

>   **a.    Plaintiffs have not alleged an intent to defraud these Plaintiffs and therefore cannot establish the predicate acts of mail and wire fraud**

A plaintiff must prove each element of the predicate act or 'racketeering activity' for a civil action under RICO to lie. "For mail fraud, [plaintiff] must prove a scheme to defraud, use of the mails in furtherance of the scheme, and intent to deprive a victim of money or property." *United States v. Rayborn*, 495 F.3d 328, 338 (6th Cir. 2007). To prove a defendant committed wire fraud, plaintiff must show "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; (3) intent to deprive a victim of money or property." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). *See also Central Distributors of Beer, Inc. v. Conn*, 5 F.3d 181, 184 (6th Cir. 1993) (specific intent to deceive required to establish predicate acts of both mail and wire fraud statutes). While Defendants deny that there was a scheme to defraud or that they used the mail or wires in furtherance of such an alleged scheme, they argue that, in any event, Plaintiffs have not alleged, and cannot allege, that Defendants specifically intended to deceive these Plaintiffs. While the Supreme Court in *Bridge, supra*, clearly removed reliance as an element of proof in a civil RICO claim, the Court did not purport to disturb the specific intent requirement for proof of the underlying predicate acts of mail or wire fraud. *See Bloodstock Research Information Servs., Inc. v. Edbain.com, LLC*, 622 F. Supp. 2d 504, 513 (E.D. Ky. 2009) (recognizing that

---

[15] Defendants' argument that Plaintiffs have not alleged that Plaintiffs relied on any of the claimed misrepresentations is foreclosed by the decision of the Supreme Court in *Bridge v. Phoenix Bond Indem. Co*., 128 S. Ct. 2131, 2145 (2008), which specifically holds that reliance is no longer a required element of proof under an alleged RICO scheme to defraud. Thus, Plaintiffs need not prove that they relied on any of the alleged misrepresentations allegedly made by Defendants regarding their status as independent contractors. As discussed below, however, *Bridge* did not disturb the requirements that a plaintiff allege specific intent to deceive in an allegation of mail or wire fraud, and that a plaintiff plead and prove actual injury and proximate cause.

reliance is no longer a required element after *Bridge,* reiterating the necessity of establishing specific intent).

Plaintiffs in *Bridge* alleged that the defendants devised a scheme under which they agreed among themselves to submit false declarations to the county about their relationship to certain entities who were engaged in bidding for tax liens at public auction. The county had a single bidder rule which prevented a bidder from sending multiple agents to bid on its behalf, thereby securing for itself a disproportionate share of the liens available at auction. *Id.* at 2135. Rejecting the argument that plaintiffs could not bring suit under RICO because they never received the false attestations and therefore could never have relied on them, the Court refused to foreclose relief to the clearly intended victims of the scheme. The Court discerned a basic injustice in the fact that the rival businesses bringing suit, who clearly could not have relied on the alleged fraudulent communications because they were sent to the county and not to the plaintiffs, would have been precluded, by a reliance requirement, from ever stating a cause of action against these defendants "even though they were the primary and intended victims of the scheme to defraud." *Id.* at 2139.

Particularly with the predicate acts of mail and wire fraud, the existence of "a convergence of [identity of] the deceived and the injured . . . seems inherent in the idea of fraud as provided in the fraud statutes and defined by the Supreme Court in *McNally.*" *Mylan Labs, Inc. v. Akzo, M.V.*, 770 F. Supp. 1053 (D. Md. 1991). There is no indication that, in declining to require proof of first-party reliance to state a RICO claim, the Court in *Bridge* meant to abandon altogether the idea that the plaintiff establish that the defendant's actions were at least intended to victimize the plaintiffs claiming relief, albeit indirectly. The Court in *Bridge* found that although the fraudulent

misrepresentations were made to the county, the intended victims of the misrepresentations were the plaintiffs, whose ability to compete with the defendants was directly affected by the misrepresentations that defendants made to the county.  Explaining how a person can be injured "by reason of" a pattern of mail fraud, although he may not have relied on the fraudulent misrepresentation, the Court hypothesized:

> [S]uppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves.  If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business "by reason of" a pattern of mail fraud, even though they never received, and therefore never relied on, the fraudulent mailings.  Yet petitioners concede that, on their reading of § 1964 (c) the rival businesses would have no cause of action under RICO, *even though they were the primary and intended victims of the scheme to defraud.*

128 S. Ct. at 2139  (citation to the record omitted) (emphasis added).  Further in its opinion, the Court in *Bridge* reiterated this concept that relief should be available to a plaintiff whom the defendant specifically intended to harm, albeit through defrauding a third party: "And the Restatement specifically recognizes 'a cause of action' in favor of the injured party where the defendant 'defrauds another for the purpose of causing pecuniary harm to a third person.'"  *Id.* at 2143 (citing the Restatement Second of Torts § 435A, Comment a).  "A scheme to defraud consists of intentional fraud, consisting in the deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end."  *Kenty v. Bank One, N.A.*, 92 F.3d 384, 389-90 (6th Cir. 1996).

Defendants claim that Plaintiffs cannot argue that they were the intended victims of the scheme to defraud.  How could they, Defendants assert, when Defendants hid nothing from them, required them to obtain DBA's as a condition to working at Meda, issuing them 1099's and admittedly classifying them as independent contractors.  Defendants argue that the intended victim

34

of the alleged scheme, according to Plaintiffs own allegations, was the government: "Meda and

Meda Painting fraudulently classified their employees, including the plaintiffs, as "independent

contractors,' and did not withhold federal withholding income taxes or FICA (social security and

Medicare), and failed to pay to the United States government the employer portion of FICA (social

security and Medicare), and unemployment tax. The plaintiffs were in fact employees and not

independent contractors, and Meda and Meda Painting knew they were employees *and intended to*

*evade federal and state taxes by classifying the workers as independent contractors.*" (Compl. ¶ 5)

(emphasis added). Indeed, as Defendants and the WCDB opinion point out, Plaintiffs were

themselves a part of the alleged scheme. They fully acquiesced to being classified as independent

contractors, obtained DBAs, accepted the allegedly fraudulent 1099's and presumably took

deductions when filing their income taxes that were available to them as independent contractors

that would not have been available to them as employees. Defendants argue that the scheme to

defraud, as alleged, was one to defraud the government, not to defraud these Plaintiffs. Also, as

discussed above, Plaintiffs were free at any time to seek a determination from the IRS or the SSA

as to their classification as independent contractors. The WCDB summarized as follows:

> The facts show that Mr. Meda did not want a traditional employer-employee
> relationship. It also appears that Mr. Lewis was agreeable to this type of
> arrangement. Mr. Lewis did accept the terms of the agreement. Of course, Mr.
> Lewis retained the option to negotiate a different arrangement or to refuse the
> arrangement outright if the terms were not to his liking. Notably, Mr. Lewis
> obtained a significant benefit by accepting the arrangement as proposed by Meda.
> Specifically, he would ultimately be paid more money each week since no payroll
> taxes were taken out of his pay. Mr. Lewis had more cash in hand as a result of this
> arrangement. . . . While I am concerned that on its face, Meda's business structure
> could be construed as a dodge to avoid not only payroll taxes but also more
> importantly, liability under the WCDA, I cannot overlook the part that plaintiff
> played in this matter. After all, plaintiff enjoyed a tangible benefit from his
> arrangement with Meda. I have no doubt that had Mr. Lewis not been injured and
> the issue of dual employment implicated, he would have continued to work under the

> same arrangement with Meda to this very day, and continued to enjoy the benefits
> of his arrangement with Meda. Plaintiff cannot have it both ways.

WCDB Op. 49. Even assuming the allegations of Plaintiffs' Complaint are true, they simply have

not alleged that the Defendants intended to deceive them. Accordingly, they have failed to allege

the essential elements of the predicate acts of mail and wire fraud.

### b. Failure to Adequately Allege Injury

Defendants argue that Plaintiffs lack standing to assert a RICO claim because they have not

demonstrated that they were injured by reason of the claimed misclassification scheme. *See Anza*

*v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). (Defs.'s Mot. 10-11.) "[T]o sustain a RICO

§ 1962 civil treble damages action against any defendant, a plaintiff must plead and prove an actual

injury to its business or property 'by reason of' a defendant's section 1962 transgression." *Pik-Coal*

*Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 889 (6th Cir. 2000). Thus Plaintiffs Complaint must

allege, beyond pure speculation, actual injury and causation. These requirements were not altered

by the Supreme Court's decision in *Bridge, supra* which emphasized that a section 1962 Plaintiff

must still show that "the alleged violation led directly to the plaintiff's injuries." 128 S. Ct. at 2142.

Plaintiffs argue that Defendants defrauded the federal government by falsely classifying

Plaintiffs as independent contractors and that Plaintiffs were injured by that scheme to defraud. But

Plaintiffs fail to allege how Defendants' misclassification resulted in an actual pecuniary loss to

them. The Supreme Court rejected a similar claim in *Anza, supra*, where the Court found Plaintiffs'

§ 1962 claim lacking in proximate cause: "Ideal accuses the Anzas of defrauding the State of New

York out of a substantial amount of money. If the allegations are true, the State can be expected to

pursue appropriate remedies. . . . When a court evaluates a RICO claim for proximate causation, the

central question it must ask is whether the alleged violation led directly to the plaintiff's injuries. In

the instant case, the answer is no. We hold that Ideal's § 1962(c) claim does not satisfy the requirement of proximate causation." 547 U.S. at 461.

Plaintiffs do not plead with any degree of specificity how they were injured by the Defendants' alleged failure to file tax returns classifying them as independent contractors. The entirety of their allegation as to RICO proximate cause, contained in paragraph 16 of their Complaint, which states: "Proximate Cause. Defendants' fraud proximately injured plaintiffs by resulting in loss of the employer portion of Medicare and social security contributions (FICA), unemployment benefit contributions." Plaintiffs provide no facts from which this Court could conclude that they sustained injury by reason of the alleged § 1962 violations, and their Complaint fails for this reason.

Plaintiffs do not allege that they actually paid their own withholding taxes under SECA and that this resulted in a net financial loss to them compared to the tax ramifications of having been classified instead as employees. Indeed, the Complaint does not even allege that Plaintiffs filed income tax returns in the years in question, or indicate what deductions they took. As to Plaintiff Lewis, the WCDB opinion indicates that Lewis did not file income tax returns for many of the years at issue. Plaintiffs do not claim that they have applied for and been denied any benefits due to their classification as independent contractors. They do not allege that in filing their tax returns, they were somehow deprived of a benefit that they would have received had Defendants classified them as employees instead of independent contractors. Indeed, they do not even allege that they filed income tax returns for the years in question.

It is impossible to tell from Plaintiffs Complaint exactly what injury Plaintiffs may have suffered. They argue that their damages are measured by "the amounts that Meda as employer was

obligated to pay on behalf of employees into FICA (about 7.5% of gross wages)." (Pls.'s Resp. Mot. Dismiss 10.) But they do not provide any facts from which the Court could begin to understand how this injured each of the Plaintiffs. Are they arguing that had they been classified as employees, Meda would have been required to pay 7.5% of their gross wages under FICA and that would have been less than Plaintiffs were actually required to withhold when filing as independent contractors under SECA? Did they actually file as independent contractors? If so, what deductions did they take? In each of the misclassification cases discussed above, in which parties attempted to file claims under FICA, these details were at least alleged.

In some cases discussing the availability of a private right of action for recoupment of FICA payments, courts have recognized that if the individual seeking recoupment properly filed tax returns claiming the available deductions, there is no ultimate financial impact to having been wrongly classified:

> Under FICA, required FICA contributions are split between an employee and employer. *Salazar v. Brown*, 940 F. Supp. 160, 163 (W.D. Mich. 1996); 26 U.S.C. §§ 3101 and 3111. Under SECA, a self-employed independent contractor is required to pay his or her own SECA taxes. For years after 1989, the total contribution under SECA and FICA is 15.3 percent of self-employment income or wages, respectively. The financial effect of this tax treatment on the independent contractor is now for the most part diminished by the fact that the contractor may deduct one-half of the SECA tax contributions from income for federal income tax purposes. Nevertheless, were the Internal Revenue Service to re-characterize self-employment income as wages for the purposes of these statutes, the re-characterization would have a significant adverse impact on the employer since it might result in large penalties and interest for the failure to file returns and to timely pay the taxes. *See* 26 U.S.C. § 6672; Rev. Ruling 71-86, 1971-1 C .B.285.

*McElwee , supra at* 771. It is impossible to glean from Plaintiffs' Complaint, what, if any, actual injury they sustained as a result of the alleged scheme to defraud. Plaintiffs' ill-defined claims of injury do not allege the nature of their loss or the requisite proximate cause to withstand Defendants'

motion to dismiss.

Plaintiffs' injury argument is further undercut by the fact that an employee's entitlement to social security benefits is in no way dependent on the amount of FICA paid by their employer. *See Salazar, supra.* Rather, an employee's entitlement to such benefits is based upon total wages earned as workers, regardless of whether their employer ever paid into FICA for them. In other words, if Plaintiffs were to bring this claim where it belongs, in front of the SSA, and the SSA concluded that Plaintiffs had been wrongly classified, Plaintiffs would be entitled to receive these benefits (assuming they had followed the law and filed tax returns for the years in question as independent contractors and there was a difference to which they were entitled) regardless of the fact that Defendants had failed to pay into the system for them. The court in *Danielsen, supra* recognized this in finding that plaintiffs' RICO claims (which were foreclosed in any event by the exclusive jurisdiction of the Safety Act) based upon misclassification as mechanics rather than aircraft workers, failed to adequately allege that plaintiffs were injured in their in their business or property:

> Furthermore, we question whether appellants come within the RICO requirement that a § 1964(c) plaintiff must be a "person injured in his business or property by reason of a violation of § 1962." While the employees may have been entitled to higher paying job classifications than they received under the defendants' employment schemes, each employee in fact received precisely the compensation bargained for in return for the agreed work. That the employees should have received more pay is a situation redressable under the SCA. The very fact that Congress enacted the SCA with its complex framework for administrative recovery suggests that Congress did not contemplate that violation of the SCA constituted the criminal felony of mail fraud.

941 F.2d at 1229.

Plaintiffs cannot establish that the alleged scheme to defraud, even if it could be established, resulted in a direct injury to them. In light of the fact that a qualifying employee receives social security benefits regardless of whether his employer complied with FICA, and given the absence of

factual content indicating the financial impact of the alleged misclassification or the direct causal link to Defendants' representations to the IRS, Plaintiffs' RICO claim fails to adequately allege injury as a result of the alleged fraudulent scheme.[16]

## C.    Plaintiffs Claims Under the Fair Labor Standards Act (29 U.S.C. §§ 201 *et seq.*) (FLSA)

To state a prima facie case of entitlement to overtime pay under FLSA, a plaintiff must allege: 1) that the defendants are engaged in commerce as defined by FLSA; (2) plaintiffs are employees as defined by FLSA; 3) as employees for defendants, plaintiffs worked more than forty (40) hours a week and were not paid overtime compensation for the hours worked in excess of forty (40). *Zhong v. August August Corp.*, 498 F. Supp. 2d 625, 628 (S.D.N.Y. 2007). "Where the plaintiff alleges violations of the FLSA's minimum and overtime wage provisions, the complaint should, at least approximately, allege the hours worked for which these wages were not received." *Id.*

Plaintiffs have completely failed to allege adequate facts in support of their overtime claim to survive Defendants' motion to dismiss. The entirety of the allegations supporting their FLSA claims is found in an obvious add-on to their allegation of proximate cause: "and time and a half pay for overtime as required by the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 et seq." (Compl. ¶ 16.) While each of the Plaintiffs signed a consent to bring suit under FLSA (First Amended Compl., Dkt. No. 7-2), these documents do not state that the consenting Plaintiff actually worked overtime nor do they indicate the hours worked, for which Plaintiffs allege not to have been paid. There is not a single allegation in the Complaint that any of the Plaintiffs ever worked a

---

[16] Plaintiffs' § 1962(d) conspiracy claim cannot stand in light of the dismissal of their substantive RICO Count. *See Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990).

minute of overtime. Indeed, in the proceedings before the WCDB, Mr. Lewis testified that he was not required to work overtime. (Defs.'s Mot. Dismiss Ex. A, Hr'g Tr. 13.) Plaintiffs add the following in their brief in response to Defendants' motion to dismiss: "Overtime pay is damages are [sic] due directly to plaintiffs. They are easily measured. They qualify as damage to 'property." (Pls.'s Resp. Mot. Dismiss 11.) This is the entirety of the factual predicate for any overtime claim as to any Plaintiff. This complete failure to allege that any Plaintiff actually worked overtime, or to provide any supporting documentation for such a claim, necessitates dismissal of Plaintiffs' FLSA claims under 12(b)(6). A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *Bredesen*, *supra* at 527(citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Id.* (citing *Twombly*, 127 S.Ct. at 1969). Plaintiffs' overtime claim is completely unsupported by any factual content and should be dismissed.

## D.     Plaintiffs' Renewed Motion for Sanctions

Also pending before the Court is Plaintiffs' Renewed Motion for Sanctions. In this motion, Plaintiffs' dispute certain factual representations, allegedly made by Defendants in their motion to dismiss, relating to the finality of proceedings before the Michigan Workers' Compensation Board. Defendants subsequently corrected this alleged misrepresentation in their response to Plaintiffs' renewed motion, indicating to the Court that Plaintiffs had rejected Defendants' offer to correct this misstatement when Plaintiff called for concurrence in the renewed motion for sanctions. In any event, the Court has not in any way considered this alleged factual misstatement regarding the

finality of the decision of the WCDB, in ruling on Defendants' motion to dismiss.

Plaintiffs also argue in their renewed motion for sanctions that Defendants are precluded from raising the issue of collateral estoppel. As discussed *supra* at note 7, the Court considers Defendants' collateral estoppel argument as it relates to Defendants' *Rooker-Feldman* argument and concludes that presentation of this issue to the Court does not support an award of sanctions.

Finally, in their renewed motion for sanctions, Plaintiffs also challenged certain representations made by Defendants in their motion to dismiss as to the law on witness immunity. The Court finds that this issue is not germane to the Court's determination that Plaintiffs have failed to state a cognizable RICO claim. The Court finds that all of the conduct cited by Plaintiffs in their renewed motion for sanctions was reasonable under the circumstances and does not support an award of sanctions. *See Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997) (holding that "the test for imposition of Rule 11 sanctions is whether the attorney's conduct was reasonable under the circumstances.") Accordingly, the Court denies Plaintiffs' Renewed Motion for Sanctions (Dkt. No. 24).[17]

## IV. CONCLUSION

This Court concludes: (1) that the decision of the WCDB that Plaintiff Lewis is an independent contractor under the WCDA has no preclusive effect in this proceeding; (2) that the exclusive remedial scheme for employee misclassification claims embodied in the IRC and the SSA

---

[17] The Plaintiffs' initial motion for sanctions (Dkt. No. 16) failed to comply with E.D. Mich. LR 7.1 in that Plaintiffs did not seek Defendants' concurrence with the motion prior to filing. When Defendants' response brought that failing to Plaintiffs' attention, Plaintiffs withdrew that motion for sanctions, sought Defendants' concurrence in the renewed motion, and when that was denied, filed the renewed motion. The Court refuses to sanction Plaintiffs for the initial violation of Local Rule 7.1.

forecloses Plaintiffs' RICO claim; (3) that Plaintiffs' RICO claim fails to adequately allege the requisite intent to commit the predicate acts and fails to adequately allege injury; and (4) Plaintiffs' FLSA claim fails to adequately plead the elements of a prima facie case under FLSA.

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss Plaintiffs Complaint (Dkt. No. 8) and DENIES Plaintiffs' Renewed Motion for Sanctions (Dkt. No. 24.)

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 10, 2010

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on May 10, 2010.

s/Denise Goodine
Case Manager